389 So.2d 1045 (1980)
The STATE of Florida, Appellant,
v.
Bernard SHAKTMAN, Appellee.
No. 79-1339.
District Court of Appeal of Florida, Third District.
October 14, 1980.
Rehearing Denied November 14, 1980.
*1046 Janet Reno, State's Atty., for appellant.
Melvin S. Black, Miami, for appellee.
Before HUBBART, C.J., and NESBITT and PEARSON, DANIEL S., JJ.
PEARSON, DANIEL S., Judge.
This is an appeal by the state from an order suppressing evidence obtained by the tape recording of telephone conversations between Shaktman and an undercover police officer.
The parties stipulated to the facts pertinent to the defendant's motion to suppress. The police, suspecting that the defendant was engaged in illegal betting, set the stage to obtain tape recorded evidence of the defendant placing bets with them. They had a telephone (to which they attached recording equipment) installed in an apartment rented and paid for by them. The undercover police officer then personally arranged with Shaktman that Shaktman would call him at the apartment number for the purpose of placing bets. Shaktman did exactly that, and his incriminating conversations were recorded with the consent of the police officer receiving the call. The police did not obtain any court order or warrant authorizing the recording of these conversations. There were no exigent circumstances which would have excused the failure to obtain a court order or warrant if one were required.
The rub, of course, is that no court order or warrant authorizing the police to tape record Shaktman's telephone conversations was required. The undercover officer's consent was enough to validate the recording. It is for that reason that we must reverse the trial court's order.
The trial court based its ruling on Tollett v. State, 272 So.2d 490 (Fla. 1973); Sarmiento v. State, 371 So.2d 1047 (Fla. 3d DCA 1979); and State v. Muscara, 339 So.2d 167 (Fla. 3d DCA 1976). Its reliance on those decisions was misplaced. Tollett merely announces the evidentiary rule that as a predicate to the admission of the tape recording or a seized conversation, the consenting party must testify that he consented to the recording. As we later explained in Franco v. State, 376 So.2d 1168 (Fla. 3d DCA 1979), once that predicate requirement for admissibility is met, the tape recording between the consenting party and the accused may be introduced into evidence, and the absence of a warrant or order, the lack of probable cause, and the nonexistence of exigent circumstances are all without significance.[1]
To the extent that Sarmiento v. State, supra, retains life after Franco, but see State v. Scott, 385 So.2d 1044 (Fla. 1st DCA 1980), it is clearly limited to its discreet setting-that is, the monitoring by two police officers stationed outside of the defendant's home of a conversation between the defendant and another within the defendant's home, about which the monitoring officers, not the officer engaged in the conversation with the defendant, testified.
*1047 As to Muscara v. State, supra, there is no life after Franco. Muscara's holding that a recording made by undercover police officers of a conversation they had with the defendant was inadmissible because of the failure of the officers to secure an intercept warrant where there was ample time to do so was dealt a death blow by Franco.[2]
The present case is controlled by Franco, and upon its authority we reverse. See also Jacobs v. State, 389 So.2d 1054 (Fla. 3d DCA 1980); State v. Steinbrecher, 389 So.2d 1043 (Fla. 3d DCA 1980); State v. Scott, supra.
Reversed.
HUBBART, Judge (dissenting).
I must respectfully dissent; I would affirm in all respects the trial court's order suppressing the tape recordings herein. In my view, the subject electronic eavesdropping constitutes an "unreasonable interception of private communications" condemned by Article I, Section 12 of the Florida Constitution because it was conducted without benefit of a valid intercept warrant under circumstances where it was admittedly practicable to have obtained one, and, accordingly, the fruits of such electronic eavesdropping were inadmissible in evidence.[1]
I continue to be profoundly disturbed that electronic eavesdropping by the state-which by common consent represents a serious assault on the personal privacy of all people[2]-can take place without any judicial control whatever, without honoring any of the constitutional limitations imposed by Article I, Section 12 of the Florida Constitution on state-conducted electronic eavesdropping, so long as an agent of the state participates in the intercepted conversation and "consents" to the interception which he himself conducts to obtain evidence of a criminal act. Indeed, the court herein states that "once [the consent] predicate requirement for admissibility is met, the tape recording between the consenting party and the accused may be introduced in evidence, and the absence of a warrant or order, the lack of probable cause, and the non-existence of exigent circumstances are all without significance." [p. 1046]. I take this to mean that a state agent may conduct the subject electronic eavesdropping at his unfettered discretion without benefit of a valid intercept warrant, without any exigent circumstances whatever, and without a shred of probable cause. With all due respect, I must protest such a sweeping grant of arbitrary authority to the state as it amounts, in effect, to an electronic writ of assistance and an unjustified invasion of personal privacy specifically prohibited by Article I, Section 12 of the Florida Constitution.

I
The law is well-settled that warrantless searches and seizures are per se "unreasonable" under the Fourth Amendment to the United States Constitution and Article I, Section 12 of the Florida Constitution, subject only to a few specifically established and well-delineated exceptions. These exceptions have been jealously and carefully drawn, and the burden is upon the state to demonstrate that the procurement of a warrant was not feasible because the exigencies *1048 of the situation made that course imperative. United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958); McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948); Norman v. State, 379 So.2d 643 (Fla. 1980); Hornblower v. State, 351 So.2d 716 (Fla. 1977); Haile v. Gardner, 82 Fla. 355, 359-61, 91 So. 376, 378 (1921); Taylor v. State, 355 So.2d 180 (Fla. 3d DCA), cert. denied, 361 So.2d 835 (Fla. 1978); Miranda v. State, 354 So.2d 411 (Fla. 3d DCA), cert. denied, 364 So.2d 888 (Fla. 1978); Britton v. State, 336 So.2d 663 (Fla. 1st DCA 1976); Shepard v. State, 319 So.2d 127 (Fla. 1st DCA), cert. denied, 328 So.2d 845 (Fla. 1975); Hannigan v. State, 307 So.2d 850 (Fla. 1st DCA), cert. denied, 315 So.2d 195 (Fla. 1975).
The law is equally well-settled that electronic eavesdropping constitutes a search and seizure within the meaning of the above constitutional provisions and, indeed, is specifically encompassed by Article I, Section 12 of the Florida Constitution.[3]Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). It is, therefore, abundantly clear that state-conducted electronic eavesdropping, like all other searches and seizures, is unreasonable when conducted without a valid intercept warrant absent exigent circumstances, and that its fruits are inadmissible in evidence. United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).
Application of the above constitutional law renders, in my view, the electronic eavesdropping in the instant case unreasonable, and its fruits inadmissible in evidence. It is undisputed on this record that the subject electronic eavesdropping of the defendant's telephone conversations took place without benefit of a valid intercept warrant under circumstances where it was imminently practicable to have obtained one and, therefore, was conducted under non-exigent circumstances. As such, the subject electronic eavesdropping must fall under the established law.
We are told, however, that notwithstanding the above law, the subject electronic eavesdropping is beyond any constitutional limitation here because a state agent participated in the intercepted conversation and consented to the electronic interception which he joined in conducting for the purpose of investigating a crime. I fail to see why this fact makes the subject electronic eavesdropping any less unreasonable. Whether conducted with or without police "consent," we nonetheless deal with warrantless electronic eavesdropping performed by the state under non-exigent circumstances. Based on the established law, such electronic eavesdropping is unreasonable under Article I, Section 12 of the Florida Constitution.
Still, it must be conceded that the result here, which otherwise seems so clear under the law, is inexplicably clouded by an uncertain and conflicting line of authority. On the federal level, the electronic eavesdropping now under discussion was determined to be outside the scope of the Fourth Amendment in Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). Yet, in Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), the Court approved the warrant requirement as a Fourth Amendment predicate for such electronic eavesdropping and quoted with approval from Mr. Justice Brennan's *1049 dissent in Lopez. Later, in United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), the Court approved the Lopez majority position without receding from Osborn; moreover, the authority of the White Court's equivocal ruling is itself doubtful as it is a plurality opinion and did not muster a majority of the Court. We are thus left, at best, with federal support for both sides of the constitutional issue stated herein.
In Florida, our Supreme Court has yet to speak authoritatively on this issue with reference to Article I, Section 12 of the Florida Constitution, although in Tollett v. State, 272 So.2d 490 (Fla. 1973), the Court in dicta expressed a strong preference, as did the Osborn Court, for electronic intercept warrants as the method by which the subject electronic eavesdropping should be conducted.[4] The district courts of appeal have spoken to the instant issue on a number of occasions, but often with conflicting and equivocal results. See State v. Scott, 385 So.2d 1044 (Fla. 1st DCA 1980); Franco v. State, 376 So.2d 1168 (Fla. 3d DCA 1979); Sarmiento v. State, 371 So.2d 1047 (Fla. 3d DCA 1979), review accepted, 25 Fla.L.W. i (1980); State v. Muscara, 334 So.2d 167 (Fla. 3d DCA 1976), cert. denied, 344 So.2d 327 (Fla. 1977); Hajdu v. State, 189 So.2d 230 (Fla. 3d DCA 1966), cert. denied, 196 So.2d 923 (Fla. 1967).
The statutory law, both federal and state, appears to authorize the subject electronic eavesdropping. See 18 U.S.C.A. § 2511(2)(c) (1970); §§ 934.03(2)(c), 934.08(3), Fla. Stat. (1979). These statutes, however, do not and cannot resolve the constitutional issue posed by this case as it is settled that constitutional issues are solely for the courts to determine. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); Corn v. State, 332 So.2d 4, 8 (Fla. 1976). Moreover, a study of the legislative history of these statutes reveal that they were never intended to settle the constitutional issue posited herein as they do nothing more than track some prior court decisions on the subject. See United States v. White, 401 U.S. 745, 790-92, 91 S.Ct. 1122, 1145, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting). Thus, the constitutional issue under discussion remains before us as unresolved as ever.
Given the conflicting and uncertain nature of the law in the area, I would return to the fundamental purpose which our constitutional search and seizure guarantee was designed to accomplish. Such an historical analysis fully supports the view, urged here, that warrantless searches and seizures, including electronic eavesdropping, which are conducted under non-exigent circumstances, are unreasonable and constitutionally impermissible.

II
It is clear, beyond any hope of successful contradiction, that the Fourth Amendment to the United States Constitution and its counterpart, Article I, Section 12 of the Florida Constitution, were adopted to end the abuse of general exploratory searches and seizures as asserted by the British Crown in the American Colonies through general writs of assistance in the period *1050 1761 to 1776.[5] Indeed, the abuses wrought by the writs of assistance regime to enforce the highly unpopular Trade and Navigation Acts passed by the British Parliament during this time was one of the primary causes of the American Revolution.[6] These general *1051 writs authorized British customs officers, without any prior court approval and without a shred of evidence, to search any private premises they selected for unspecified smuggled goods for the entire lifetime of the reigning English sovereign plus six months subsequent to the sovereign's death, without ever having to account to a court of law for any property they might seize.[7]
All the colonial courts in America, save the courts in Massachusetts and New Hampshire, resisted issuing such writs of assistance, despite strong and continued pressure from the British Crown, as they were, in their view, unauthorized by English law.[8] And in Massachusetts, the colonial courts issued these general writs of assistance in 1761 only over the eloquent legal protest of James Otis, Jr. A group of Boston merchants who were represented by Otis had petitioned the Massachusetts colonial court in 1761 not to reissue the general writs of assistance upon the death of the then-reigning English sovereign. Otis' legal argument in that case expresses well the reasons why this country felt so deeply against the general writs of assistance and the abuses which they represented.
Specifically, Otis argued that under the applicable acts of Parliament,[9] a court was authorized to issue only special writs of assistance based on probable cause specifically describing the place to be searched and the things to be seized; that general writs of assistance, as requested by the Crown, were unauthorized under English law as they gave customs officers unlimited authority to search any private premises at the officers' unfettered discretion. Such a general writ, he said, "places the liberty of every man in the hands of every petty officer." 2 Legal Papers of John Adams, supra note 7, at 142. Moreover, Otis added in words which spoke for the nation:
"[I] will to my dying day oppose, with all the powers and faculties God has given me, all such instruments of slavery on the one hand, and villainy on the other, as this writ of assistance is. It appears to me (may it please your honours) the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of the constitution, that ever was found in an English law-book." Id. at 139-40.[10]
John Adams, who was a spectator in the courtroom to this legal argument by Otis and later one of the principal architects of American Independence, subsequently wrote:
"I do say in the most solemn manner, that Mr. Otis's oration against writs of assistance breathed into this nation the breath of life." 10 Works of John Adams 276 (1856).
"American independence was then and there born... . Every man of a crowded audience appeared to me to go away, as I did, ready to take arms against writs of assistance. Then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born. In 15 years, namely in 1776, he grew up to manhood and declared himself free." Id. at 247-48.
More than any other provision of the Bill of Rights, then, the Fourth Amendment and its counterpart in state constitutions[11] *1052 deal with a fundamental right of such historic importance that this country, in part, fought a revolution in order to guarantee its preservation to the individual. It must, accordingly, be considered a right of preeminent significance to the founding of this country. Moreover, in Florida, that right has been specifically extended in our state constitution to prohibit, as here, unreasonable electronic interceptions. Art. I, § 12, Fla. Const.

A
The court's decision herein sanctions what, in my view, is a general writ of assistance to the police to conduct electronic eavesdropping of any conversation where one of their number is a participant and consents to the interception. Just as the general writs of assistance authorized British customs officers to conduct, at their discretion, general searches and seizures of private premises, so the court herein authorizes the police at their discretion to conduct electronic searches of private conversations in which the latter participate and consent to the interception. Such a holding flies in the face of the central purpose of Article I, Section 12 of the Florida Constitution, which extends its protection to electronic searches and seizures, and is, in my view, false to the constitutional history which gave rise to its enactment. We seem to have forgotten that we fought a revolution, in part, to end the abuses wrought by the general writs of assistance regime. Now it seems that the regime which was so thoroughly hated and fought is allowed to exist, in part, in this state, despite the presence of a constitutional provision designed to end it. I think we should enforce the letter and spirit of that constitutional provision and declare this electronic writ of assistance invalid.

B
It is urged that as the police may constitutionally repeat to the outside world everything they hear in a private conversation they have with anyone, Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), that a fortiori they may electronically record the entire conversation and play it for the outside world. This is a specious argument. It is one thing for the police to verbally repeat to the outside world a conversation they have had with a private individual as no outside party, by this practice, becomes a listener to the original conversation; indeed, no electronic eavesdropping of any type has taken place. It is quite another thing, however, for the police to electronically intercept and record the same conversation and thereafter play the tape recording to the outside world as everyone, by this practice, has been made an actual listener to the original conversation. In short, in the latter situation, we deal with electronic eavesdropping governed by our constitution, but not so in the former.
Under Article I, Section 12 of the Florida Constitution, a person has, or ought to have, a reasonable expectation of privacy that the only listeners to a private conversation in which he participates are the people involved in such conversation. The writ of assistance practice sanctioned in this case makes us all take the risk that the entire world is an unknown and unseen listener to every private conversation we have as long as a police agent participates therein and "consents" to an electronic interception thereof. Surely the events of recent history should teach us, if our colonial past does not, that we owe ourselves and our posterity a better country than that. Indeed, the best argument for freedom in this troubled century is the horror of a world without it. See e.g., Solzhenitsyn, The Gulag Archipelago (1973); Bullock, Hitler: A Study in Tyranny (1953).

C
We are told that our citizens are nonetheless protected from the arbitrary electronic search power sanctioned by this case because, in any event, the police agent participant *1053 in the private conversation must "consent" to the surreptitious electronic eavesdropping. With all due respect, I find such a protection illusory. Just as a general exploratory search of private premises cannot be upheld because the police officer conducting the search consented to it, so a general electronic search of a private conversation cannot be upheld because the police officer who engaged in the surveillance and participated in the conversation consented to the interception. The individual's right of privacy is in no way protected by the government's consent to this invasion of his privacy. Indeed, all invasions of privacy enjoy governmental consent else the invasion itself would never have been accomplished.

D
We are all justly proud of the right of free speech which this country protects through its Bill of Rights in the federal and state constitutions. That right, however, is jeopardized by today's decision. All of us must now take the risk that everything we say in a private conversation may be surreptitiously recorded by the police when a police agent participates therein and "consents" to such surveillance. In my view, to impose such a risk on our citizens is to place a chilling effect on the right of free speech. Who among us are willing to have our private conversations spread on the public record and played to everyone at the government's unfettered discretion. Freewheeling private conversations liberate daily life; they are filled with the frivolous, the serious, the intimate, the outrageous, and even the profane. We are now told, however, that our private conversations belong to the government so long as a government agent talks to us and "consents" to an electronic eavesdropping thereof. With all due respect, I find such a result intolerable. None of us can truly have a right of free speech when we are required, as the court herein holds, to take the risk that every person to whom we talk may be a government agent who is recording everything we tell him. Surely, we cannot live in the long run with such a totalitarian result.

III
Finally, I cannot help reflecting that the sordid nature of this petty gambling case tends to obscure the fundamental importance of the issue involved herein. If this case involved only the defendant's fate, I might join the court in reversing the order under review and be done with it. But much more is involved, namely, the fundamental privacy rights of all of our citizens. What we define here as the scope of the defendant's rights in this case defines the rights of all of us as well. It is a sobering thought and should give us reason to pause.[12]
Given the gravity of the constitutional issue which faces us, it is my view that the court's ruling in this case is contrary to the letter and spirit of Article I, Section 12 of the Florida Constitution and thereby weakens our constitutional ideal of personal freedom. The decision here should remind us once again what a fragile ideal personal freedom is, what a painfully slow, erratic course it has taken over the years, both in this area of law and others, and how its attainment is not a natural birthright, but a hard won acquisition. At a time when the future of freedom is threatened by the thirst for totalitarian solutions to social and economic problems the world over, at a time when even our own country is convulsed with seemingly intractable problems which make the survival of freedom far from inevitable, we might profitably reflect on the words of an earlier court as to our duty in cases of this nature:
"[T]he court must be vigilant to scrutinize the attendant facts with an eye to detect and a hand to prevent violations of the Constitution by circuitous and indirect methods. Constitutional provisions for the security of person and property *1054 are to be liberally construed, and `it is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon' (citations omitted)... . The Fourth Amendment was adopted in view of long misuse of power in the matter of searches and seizures both in England and the colonies; and the assurance against any revival of it, so carefully embodied in the fundamental law, is not to be impaired by judicial sanction of equivocal methods, which, regarded superficially, may seem to escape the challenge of illegality but which, in reality, strike at the substance of the constitutional right." Byars v. United States, 273 U.S. 28, 32-34, 47 S.Ct. 248, 249-50, 71 L.Ed. 520-24 (1927).
Application of this wise rule of constitutional adjudication lends further support, in my judgment, to the view which I take in this case.
In addition to the above, I rely upon the authorities and analysis developed in my dissenting opinion in Franco v. State, 376 So.2d 1168, 1170 (Fla. 3d DCA 1979) (Hubbart, J., dissenting). For all of these reasons, I sincerely regret the court's decision herein and can only hope that someday it will be reversed. Until then, we live in a country which is less free than our founding fathers envisioned.
NOTES
[1] These issues are relevant only in the absence of consent. Section 934.03(2)(c), Florida Statutes (Supplement 1978), provides: "It is lawful under this chapter for a law enforcement officer ... to intercept a wire or oral communication when ... one of the parties to the communication has given prior consent to such interception and the purpose of such interception is to obtain evidence of a criminal act." See also State v. Napoli, 373 So.2d 933 (Fla. 4th DCA 1979) (holding that the custody and seal provisions of Section 934.09 do not apply to consent interceptions which require no judicial authorization).
[2] The Franco court expressly receded from Muscara to the extent its holding was in conflict.
[1] I would rest the result in this case solely on Article I, Section 12 of the Florida Constitution, rather than the Fourth Amendment, not because I feel the Fourth Amendment is inapplicable here, but because the federal law on the subject issue as will be demonstrated later-is uncertain, conflicting, and, in the nature of things, susceptible of final resolution only by the United States Supreme Court. In the meantime, it is clear beyond doubt, that Florida courts can interpret the search and seizure guarantee of our state constitution in the way urged herein. Cooper v. California, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967). This is particularly apt as to Article I, Section 12 of our constitution, as it was amended in 1968 to specifically encompass unreasonable electronic eavesdropping, which, I believe, speaks volumes in favor of striking down all warrantless electronic eavesdropping conducted, as here, under non-exigent circumstances.
[2] See S. Dash, The Eavesdroppers (1959).
[3] Article I, Section 12 of the Florida Constitution reads as follows:

"The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated. No warrant shall be issued except upon probable cause, supported by affidavit, particularly describing the place or places to be searched, the person or persons, thing or things to be seized, the communication to be intercepted, and the nature of evidence to be obtained. Articles or information obtained in violation of this right shall not be admissible in evidence."
[4] "The object of the new language in Section 12, Article I is to insure that before a wiretap is made a judicial officer will determine whether there is probable cause to make the tap. A citizen's privacy is supposed to be protected to the extent of having a magistrate determine in advance whether his private conversations should be `bugged' by the police because of suspected criminality. Captain Campbell did not take the trouble to have a judge determine in advance whether there was justification for the wiretap. He went ahead and made the `tap' without prior judicial approval. This is a circumvention of a citizen's right guaranteed by Section 12, Article I, and cannot be sanctioned." 272 So.2d at 495-96. It is true, however, that the Court disapproved the proof of consent given in the case because the police informer was not called to testify on the issue. It is equally true that the Court's decision contains language which indicates that, had this been accomplished, a different result would have obtained. Nonetheless, the Court was not faced with the issue which confronts us in the instant case, namely, whether the failure to obtain a warrant for the subject electronic eavesdropping in itself renders such eavesdropping unreasonable. As such, Tollett does not settle the subject constitutional issue in this cause.
[5] Weeks v. United States, 232 U.S. 383, 390, 34 S.Ct. 341, 343, 58 L.Ed. 652 (1914); Boyd v. United States, 116 U.S. 616, 625-26, 6 S.Ct. 524, 529-30, 29 L.Ed. 746 (1885). "The [Fourth] Amendment was adopted in response to deep resentment against the general warrant (known as the writ of assistance) used by British customs officials to search for goods smuggled into the Colonies in violation of the trade and navigation acts, which severely restricted the ability of the colonies to trade with areas outside the Empire." J. Landynski, Search and Seizure, in The Rights of the Accused 30 (S. Nagel ed. 1972). "In years prior to the Revolution leading voices in England and the Colonies protested against the ransacking by Crown officers of the homes of citizens in search of evidence of crime of illegally imported goods. The vivid memory by the newly independent Americans of these abuses produced the Fourth Amendment as a safeguard against such arbitrary official action by officers of the new Union, as like provisions had already found their way into State Constitutions." Frank v. Maryland, 359 U.S. 360, 363, 79 S.Ct. 804, 807, 3 L.Ed.2d 877 (1959). The words of the Fourth Amendment "reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever `be secure in their persons, houses, papers and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant. Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws." Stanford v. Texas, 379 U.S. 476, 481, 85 S.Ct. 506, 510, 13 L.Ed.2d 431 (1965). "Prior to the Revolution, the liberty of the citizen in the colonies was harassed by writs of assistance in the hands of revenue officers... . These writs were exasperating to the citizen, contrary to every democratic impulse and were considered the most flagrant examples of arbitrary power known to the people, hence the language of the Fourth Amendment which was repeated in all the State Constitutions [including Florida]." Church v. State, 151 Fla. 24, 29-30, 9 So.2d 164, 166-67 (1942).
[6] "Historically we are dealing with a provision of the Constitution [the Fourth Amendment] which sought to guard against an abuse that more than any one single factor gave rise to American independence." Harris v. United States, 331 U.S. 145, 159, 67 S.Ct. 1098, 1105, 91 L.Ed. 1399 (1947) (Frankfurter, J., dissenting). "Mr. Justice Frankfurter wisely pointed out in his Rabinowitz dissent that the [Fourth] Amendment's proscription of `unreasonable searches and seizures' must be read in light of `the history that gave rise to the words'-a history of `abuses so deeply felt by the Colonies as to be one of the potent causes of the Revolution... .' The Amendment was in large part a reaction to the general warrants and warrantless searches that had so alienated the colonists and had helped speed the movement for independence." Chimel v. California, 395 U.S. 752, 760-61, 89 S.Ct. 2034, 2038-39, 24 L.Ed.2d 685 (1969).

On November 2, 1772, a committee of 21 was appointed by the inhabitants of Boston to state the rights of the American Colonists as British subjects. The committee later presented its report, which contained a lengthy protest against the general writs of assistance. H. Gray, Quincy's Massachusetts Reports 1761-1772, 466-67, app. I (1865); J. Landynski, Search and Seizure and the Supreme Court 38 n. 90 (1966); N. Lasson, the History and Development of the Fourth Amendment to the United States Constitution 72 (1937); 1 The Bill of Rights: A Documentary History 200, 205-206 (B. Schwartz ed. 1971).
On October 26, 1774, the First Continental Congress in Philadelphia petitioned the English King for a redress of grievances. Among the listed abuses was this protest: "The officers of the customs are empowered to break open and enter houses, without the authority of any civil magistrate, founded on legal information." J. Landynski, Search and Seizure and the Supreme Court 37-38 (1966); N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 75 (1937).
Finally, the July 4, 1776 Declaration of Independence protests the abuses wrought by the hated Trade and Navigation Acts. As to the writs of assistance, the Declaration condemns the English King for sending "swarms of officers, to harass our people" and for making colonial judges "dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries." 1 The Bill of Rights: A Documentary History 251, 253 (B. Schwartz ed. 1971). These references, although indirect, seem clearly to include the search powers asserted by the English customs officers and the persistent pressure exerted by the British Crown upon the colonial judges to legitimize this practice. Dickerson, Writs of Assistance as a Cause of the Revolution, in The Era of the American Revolution 73 (R. Morris ed. 1939); N. Lasson, supra, at 80.
[7] N. Lasson, supra note 6, at 53-55, 57. J. Landynski, Search and Seizure and the Supreme Court, supra note 6, at 33 n. 59. For a copy of a typical general writ of assistance, see 2 Legal Papers of John Adams 144-47 (L. Wroth and H. Zobel eds. 1965).
[8] J. Landynski, Search and Seizure and the Supreme Court, supra note 6, at 36-37.
[9] 12 Car. II, c. 19, 7 Pickering Statutes at Large 460-61 (1660); 13 & 14 Car. II, c. 11, 8 Pickering Statutes at Large 78-94 (1662); 7 & 8 Will. III, c. 22, 9 Pickering Statutes at Large 428-37 (1696); 1 Anne stat. 1, c. 8, 10 Pickering Statutes at Large 414-17 (1701); 7 Geo. III, c. 46, 27 Pickering Statutes at Large 505-12 (1766).
[10] Otis' argument is taken from the Massachusetts Spy, April 29, 1773, at 3, cols. I-3, reprinted in 2 Legal Papers of John Adams, supra note 7, at 139-44.
[11] Every state in the union has a search and seizure guarantee in its state constitution. Mr. Justice Frankfurter, in his dissenting opinion in Harris v. United States, 331 U.S. 145, 160 n. 5, 67 S.Ct. 1098, 1106 n. 5, 91 L.Ed. 1399 (1947), collects these guarantees as they first appeared in the respective state constitutions. See also Art. I, § 14, Alaska Const. (1959); Art. I, § 5, Hawaii Const. (1959).
[12] In this connection, one is reminded of Mr. Justice Frankfurter's insightful observation:

"It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people." United States v. Rabinowitz, 339 U.S. 56, 69, 70 S.Ct. 430, 436, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting).