# SIXTH DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

Case No. 6D2023-3218
Lower Tribunal No. 22-CT-4491

_____

STATE OF FLORIDA,

Appellant,

v.

THEODORE BARNES TATUM,

Appellee.

_____

Appeal from the County Court for Orange County.
Faye L. Allen, Judge.

October 17, 2025

MOE, A.G., Associate Judge.

The State of Florida appeals the trial court's order granting defendant Theodore Barnes Tatum's motion to suppress. We have jurisdiction. Art. V, § 4, Fla. Const.; Fla. R. App. P. 9.140(c)(1)(B). For the reasons stated here, we conclude that the trial court erred in granting the motion. Accordingly, we reverse.

## I.

## A.

Just before midnight, Theodore Tatum was driving southbound in a northbound lane of Orange Blossom Trail. On this six-lane highway in a heavily populated area of Orange County, Florida, vehicles around Mr. Tatum honked their horns. The noise attracted the attention of Sergeant Daniel Shapiro of the Orange County Sheriff's Office, who happened to be traveling in a southbound lane of Orange Blossom Trail. As Sergeant Shapiro looked on, Mr. Tatum swerved across the grassy median and continued southbound in a southbound lane.

It is a traffic violation to drive over a median, so, when the light turned green, Sergeant Shapiro initiated a traffic stop and directed Mr. Tatum to pull over. With no further erratic movements, Mr. Tatum pulled into a gas station. He parked, exited his vehicle, and walked to the front of the patrol car at Sergeant Shapiro's direction.

The groin area of Mr. Tatum's khaki pants was visibly wet. Amiably conversing with Deputy Shapiro, Mr. Tatum made no effort to explain. When Mr. Tatum did not explain why his pants were wet, Sergeant Shapiro asked Mr. Tatum if he had any medical conditions. He said, "[t]he reason I'm asking you—you—it looks like you urinated yourself." Mr. Tatum's response was that he was at a bar and had been drinking. As Sergeant Shapiro was removing a firearm in Mr. Tatum's pocket, he smelled the odor of alcohol.

2

Mr. Tatum acknowledged he'd been driving the wrong way on the highway. He explained that he became confused when exiting a parking lot. At one point, he asked Sergeant Shapiro if he worked for Winter Park, even though Orange Blossom Trail is not in Winter Park.

Sergeant Shapiro believed Mr. Tatum was impaired. Because Sergeant Shapiro was the supervisor that evening and therefore responsible to take and monitor other calls for service, he requested the assistance of another officer to conduct a DUI investigation.

## B.

Deputy Stowe arrived on the scene. Sergeant Shapiro conveyed his observations and then Deputy Stowe performed his own DUI investigation. Deputy Stowe observed the wet area on Mr. Tatum's pants. He asked Mr. Tatum if he urinated on himself. Mr. Tatum responded, "no, a buddy of mine spilled a drink." Deputy Stowe asked him if he had anything to drink that night, and Mr. Tatum responded "a few glasses of wine" over four hours. Deputy Stowe smelled the odor of alcohol on Mr. Tatum's breath, heard slurring in Mr. Tatum's speech, and saw that Mr. Tatum's eyes were glossy.

Mr. Tatum consented to field sobriety exercises. When Deputy Stowe asked Mr. Tatum if he agreed that the area where the exercises would be conducted was flat and free of debris, Mr. Tatum asked if Deputy Stowe wanted him to "dance out

3

there or what?" When Mr. Tatum could not complete the field sobriety exercises, he claimed Deputy Stowe was "trying to make [him] a bad person," and should "charge [him] with something" because "I don't give a fuck." Mr. Tatum told Deputy Stowe, "I got an attorney that I can—I can—shove it up your ass." Then Mr. Tatum explained that he was 77 years old, "most people I know that are my age can't even walk straight," he "grew up in Orlando," and has been in Orlando "since 19-fucking-53." Mr. Tatum then told Deputy Stowe "I'm done. Fuck you. I'm done."

Deputy Stowe then arrested Mr. Tatum for DUI. The results of his breath-alcohol test yielded breath-alcohol levels of 0.161 and 0.163.

II.

When reviewing a trial court's ruling on a motion to suppress, we defer to the court's factual findings if they are supported by competent, substantial evidence, but we review de novo the court's legal conclusions and application of law to the facts. *Alahad v. State*, 362 So. 3d 190, 200 (Fla. 2023); *State v. Hickman*, 363 So. 3d 217, 218–19 (Fla. 6th DCA 2023).

4

III.

A.

The exclusionary rule was developed by the United States Supreme Court for the express purpose of deterring police misconduct in violation of the Fourth Amendment to the United States Constitution. *See Terry v. Ohio*, 392 U.S. 1, 12 (1968) (explaining "experience has taught that it is the only effective deterrent to police misconduct in the criminal context, and that without it the constitutional guarantee against unreasonable searches and seizures would be a mere 'form of words.'"); Amend. IV, U.S. Const. ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); *see also Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (incorporating Fourth Amendment exclusionary rule against the states). Though the Florida Supreme Court adopted the exclusionary rule to remedy violations of the Florida Constitution in 1927, *see Gildrie v. State*, 113 So. 704, 706 (Fla. 1927), the rule is now supplied by the text of the Florida Constitution by way of its express conformity with the Fourth Amendment jurisprudence of the United States Supreme Court:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures . . . shall not be violated. . . . This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court. Articles or information obtained in

5

> violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution.

Art. I, § 12, Fla. Const.

We note here that the Fourth Amendment was a reaction to abuses of governmental power in England and the American colonies in the form of general warrants, which were court orders that named neither a suspect nor a place to be searched and gave governmental authorities nearly unrestrained ability to search and seize evidence. *See Stanford v. Texas*, 379 U.S. 476, 481–82 (1965); Thomas M. Cooley, *Treatise on the Constitutional Limitations* 299 n.3 (2d ed. 1871). Of particular concern to "the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists" and which "had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws." *Stanford*, 379 U.S. at 481. James Otis denounced the writs as "'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book,' because they placed 'the liberty of every man in the hands of every petty officer.'" *Id.*; *see also Boyd v. U.S.*, 116 U.S. 616, 624–25 (1886) (chronicling John Adams's observation that James Otis's public debate over the use of writs of assistance "was the first scene of the first act

of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.'"); *State v. Shaktman*, 389 So. 2d 1045, 1049–50 (Fla. 3d DCA 1980) (Hubbart, J., dissenting) ("It is clear, beyond any hope of successful contradiction, that the Fourth Amendment to the United States Constitution and its counterpart, Article I, Section 12 of the Florida Constitution, were adopted to end the abuse of general exploratory searches and seizures as asserted by the British Crown in the American Colonies through general writs of assistance in the period 1761 to 1776."); *id.* at 1051 (recognizing that John Adams was so moved by James Otis's "eloquent legal protest" against general writs of assistance in a trial in the colonial courts that he later said Otis's arguments "breathed into this nation the breath of life.").

Against this historical account of the Fourth Amendment's purposes, we can see why "[t]he exclusionary rule has its limitations . . . as a tool of judiciary control." *Terry*, 392 U.S. at 13. "It cannot properly be invoked to exclude the products of legitimate police investigative techniques on the ground that much conduct which is closely similar involves unwarranted intrusions upon constitutional protections." *Id.* "It must always be remembered that what the Constitution forbids is not *all* searches and seizures, but *unreasonable* searches and seizures." *Elkins v. United States*, 364 U.S. 206, 222 (1960) (emphasis added).

A search or seizure is reasonable if the officer reasonably suspects that criminal activity "may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Repeatedly, the Supreme Court has explained that courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Id.* (citing *United States v. Cortez*, 449 U.S. 411, 417–418 (1981)). The court must determine whether the totality of the facts available to the officer at that moment would lead an officer of reasonable caution to believe that the action the officer took was appropriate. *Terry*, 392 U.S. at 21–22.

Florida law makes it unlawful "for any person who is under the influence of alcoholic beverages or controlled substances, when affected to the extent that the person's normal faculties are impaired or to the extent that the person is deprived of full possession of normal faculties, to drive or be in actual physical control of any motor vehicle within this state." § 316.1934(1), Fla. Stat. In order to detain a suspect for DUI investigation under the Fourth Amendment, the officer must have reasonable suspicion that the detainee committed the offense. *See State v. Taylor*, 648 So. 2d 701, 703 (Fla. 1995). A reasonable suspicion "has a factual foundation in the circumstances observed by the officer, when those circumstances are interpreted in the light of the officer's knowledge and experience." *Origi v. State*,

912 So. 2d 69, 71 (Fla. 4th DCA 2005) (quoting *State v. Davis*, 849 So. 2d 398, 400 (Fla. 4th DCA 2003)).

B.

Mr. Tatum asserts that Sergeant Shapiro's suspicion that he was driving under the influence was unreasonable, because when Sergeant Shapiro observed that Mr. Tatum drove against traffic, drove over the median, admitted to drinking that night, smelled of alcohol, did not know what city he was in, and appeared to have wet his pants, there was a potential innocent explanation for each of those observations. For example, he could have been lost. Being lost could have made him confused. Perhaps his vision is poor, because of his age. Rejecting the State's totality of the circumstances argument, the trial court agreed with Mr. Tatum and granted his motion to suppress all evidence obtained during the DUI investigation. The court opined that age, poor eyesight, or some combination of the two could have explained Mr. Tatum's driving decisions. The fact that "[s]ometimes people who are older do have, you know, worse eyesight" led the court to speculate that perhaps "it's not really even an age thing, . . . it could have contributed to the driving on the wrong side of the road." While making clear it was not ordering Mr. Tatum to have his vision tested, "personally" the court expressed a belief that Mr. Tatum needed "to go have his eyes checked" because "I mean, that's something that appears to the

9

Court to, maybe, have been going on with him. If he made a left turn short, then something is going on with his vision."

The trial court also grounded its reasoning in the idea that certain factors cut against the conclusion that Mr. Tatum was impaired. For example, Mr. Tatum responded appropriately when he was ordered to pull over. He did not weave, he followed the officer's orders, he went to a safe location in an open area, came to a complete stop, immediately took out his driver's license for the officer, was calm and responsive to the officer, and the officer initially did not observe slurred speech or glossy eyes.

Although the State had asked the court not to consider the fact that the officers believed Mr. Tatum had urinated on himself, the court did it anyway. It said it was not its "job to second-guess the officers," but concluded that there was "no reason" for the DUI investigation "other than that he saw a wet area on the defendant's area of his body," which might not have been urine. Noting that the officers "didn't smell anything," the court concluded that the wetness of Mr. Tatum's pants was "just as likely to have been soda as it was urine."

C.

The State is correct that the trial court erred both in its legal analysis and the application of that analysis to the facts. The court engaged in a divide-and-conquer analysis in which Sergeant Shapiro's observations were parsed out, examined in

10

isolation, and divorced from context. Instead, it should have analyzed the reasonableness of Sergeant Shapiro's suspicion in view of the totality of the circumstances. It was not necessary for Sergeant Shapiro to rule out every possible non-criminal explanation of the facts before he could reasonably suspect Mr. Tatum was impaired.

It has long been recognized that "when used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." *Cortez*, 449 U.S. at 419. Considering the totality of the circumstances, the question is whether the officer can demonstrate a "particularized and objective basis" for suspecting legal wrongdoing. *Arvizu*, 534 U.S. at 273. This approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." *Id.* Even when the individual facts could be "susceptible of innocent explanation," the question is whether the total picture is sufficient. *Id.* at 277–78. Here, Sergeant Shapiro personally observed that Mr. Tatum, (1) just before midnight, (2) drove the wrong way on a busy six-lane highway, (3) in a heavily-populated area, then (4) swerved across the median, (5) emerged from his car with suspiciously wet pants, (6) admitted he had been drinking, (7) smelled of alcohol,

11

and (8) thought he was in another city. Even if each of these facts in isolation could have a non-criminal explanation, Sergeant Shapiro testified that he considered those facts together and it was the totality of the circumstances that gave rise to his suspicion.

In the relative comfort and quiet of a courtroom, it may be possible for a judge to imagine non-criminal explanations for the individual circumstances that made a law enforcement officer suspicious. However, under the law we are compelled to follow, the appropriate question is whether the officer's suspicion was reasonable considering the totality of the circumstances and the officer's experience and specialized training. If the officer's suspicion was reasonable, neither the personal liberty that article I, section 12 exists to preserve nor the exclusionary rule that exists to deter police misconduct justifies judicial second-guessing of the type the record reveals here.

REVERSED and REMANDED.

BROWNLEE and GANNAM, JJ., concur.

James Uthmeier, Attorney General, Tallahassee, and Richard A. Pallas, Jr., Assistant Attorney General, Daytona Beach, for Appellant.

Kendell K. Ali and Laura L. Parker, of Ali & Blankner, Orlando, for Appellee.

NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING AND DISPOSITION THEREOF IF TIMELY FILED. ANY MOTIONS FOR REHEARING ARE DUE 10 DAYS AFTER THIS OPINION'S ISSUANCE. ANY RESPONSES ARE DUE 10 DAYS LATER.